UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA


v.                          CRIMINAL ACTION NO. 2:06-00114


WHITE BUCK COAL COMPANY



MEMORANDUM OPINION AND ORDER


        Pending is the motion of the United States to determine
conflict of interest, filed October 11, 2006.

        On December 7, 2006, came the government, by Hunter P.
Smith, Jr., and Susan M. Arnold, Assistant United States
Attorneys, and came the defendant, White Buck Coal Company
("White Buck"), by Neva G. Lusk of Spilman Thomas & Battle, and
Patrick J. Slevin, Patton Boggs, LLP, for a hearing on the
government's motion.  Testimony was taken from William Edwin
Wine, a former White Buck employee, and Mark E. Heath, an
attorney employed by Spilman Thomas & Battle.  Wine's lawyer,
Warren Randolph McGraw, accompanied him at the hearing.

I.


        At all material times, White Buck has been engaged in
the production of coal at an underground mine near Leivasy known
as Grassy Creek No. 1 ("mine").  By virtue of its effect upon
commerce, White Buck is subject to the Federal Mine Safety and
Health Act of 1977 ("the Act"), 30 U.S.C. §§ 801 <u>et</u> <u>seq</u>. and its
accompanying regulations.  Title 30 U.S.C. § 820(f) provides as
follows:

> Whoever knowingly makes any false statement,
> representation, or certification in any application,
> record, report, plan, or other document filed or
> required to be maintained pursuant to this chapter
> shall, upon conviction, be punished by a fine of not
> more than $10,000, or by imprisonment for not more than
> five years, or both.

30 U.S.C. § 820.  According to the second superseding indictment,
30 C.F.R. sections 75.360(a)(1), (e), and (f), part of the
regulations accompanying the Act, respectively impose the
following:

> the requirement . . . that a certified person
> designated by the mine operator make a pre[-]shift
> examination within three hours preceding the beginning
> of any eight-hour interval during which any person is
> scheduled to work or travel underground;
>
> the requirement . . . that the person doing the pre[-]
> shift examination certify that the examination was
> made; and
>
> the requirement . . . that a record of the result of

2

each pre[-]shift examination, including a record of
hazardous conditions and their locations found by the
examiner during each examination and of the results and
locations of air and methane measurements, be made on
the surface before any persons other than certified
persons conducting the pre[-]shift examinations enter
any underground area of the mine.

(Sec. Sup. Indictmt. ¶¶ 2(a)-(c)).

Wine is certified as a mine foreman.  (Tr. at 12).
Wine has worked in the mines since 1992.  (Id. at 11).  He became
employed by certain subsidiaries of Massey Energy Company in
1997, eventually coming aboard with White Buck at the mine around
February 2002.  (Id.)  When Wine commenced work at the mine, he
was the production foreman on the evening shift.  (Id. at 12).
Following the elimination of the evening shift, Wine began
working as the midnight shift foreman.  (Id. at 13).  In that
capacity, Wine was responsible for conducting the pre-shift
examination of the mine required by the regulations accompanying
the Act.  (Id. at 14).  Wine was also responsible for keeping the
required written record of the pre-shift examination.  (Id.)

On June 27, 2002, at approximately 11:30 a.m., two
inspectors with the Mine Safety and Health Administration
("MSHA"), James Starcher and Paul Hess, visited the mine.  (Id.
at 14, 39).  Their ensuing inspection resulted in a citation to
Wine which stated pertinently as follows:

3

> There was no pre-shift examination conducted by a
> certified person designated by the operator, prior to
> personnel entering the under ground area of the mine on
> 06-27-2002, on the midnight shift.  The pre-shift book
> had been filled out for 06-27-2002 indicating that the
> examination had been conducted and completed between
> the hours of 0930 PM and 1130 PM.

(Gov't. Ex. 1).  Wine advised the investigators that he was

instructed by his White Buck supervisors to perform the pre-shift

duties in the unlawful manner that led to the citation.  (Tr. at

17).

Wine was sent home by mine officials on June 28, 2002,

following the incident.  (Id.)  He was given a letter of

reprimand, which was placed in his personnel file, and he was

told by the mine superintendent, Ronald McClung, no further

repercussions would ensue.  (Id.)  The letter of reprimand

provided pertinently as follows:

> I have always instructed people in charge of pre-
> shift examines [sic] to fully pre[-]shift the area of
> their responsibility including you, (Eddie Wine) prior
> to next shift coming to work.

> In event this would ever happen again company . .
> . & myself will enforce what ever disciplinary action
> is required from time off without pay to discharge from
> your duties to take care of problem.

(Gov't. Ex. 2).  The letter of reprimand was signed by both

McClung and Wine.  (Id.)

Wine and McClung generated an additional document known

4

as a Violation Analysis.  (Gov't. Ex. 3).  Although the document
is unintelligible in some respects, the parties have stipulated
to the following material language appearing therein:

> Didn't Know that Foreman Couldn't take personal [sic: personnel?] underground doing
> examination. Had filled Book out to make sure it was done Right, also was under the Impreshtion
> [sic: impression?] that Pre-shift was not Done until called out and Know [sic: No] Callout Time was
> Recorded Regarding Time Put Down always arrive at Mine Site Between 9:30-9:45. Was youst [sic:
> used?] to Going under ground at That Time, and was not Paying atinction [sic: attention?] to time.  I
> [illegible: Had Man Came?] back outside and Pre shifted mine, I always wont [sic: want?] to Do the
> Right thing and Thought I was Doing the Right thing, or would have Done it Right From the start.
> Told Inspector (Paul Hess) that I thought I was doing it Right. After this Citation I know that Mine
> has to be Pre shifted Before Someone goes under ground unless certified person.

(Stip. of Parties (Dec. 15, 2006) (translating Gov't. Ex. 3)).
McClung directed Wine to fill out the portion of the Violation
Analysis reproduced above.  Wine recounted during his testimony
that he advised McClung as follows:

    I said . . . he was there when [Grassy Creek Production
    Manager] Larry [Roop] told me to do it this way, and I
    told him, I said, "You know, Ron, you know I was told
    to do it this way, you was there."  He said, "George
    Smith said that you needed to do this, you sign this
    [Violation Analysis], and this is the end of it, it's
    all over.  As far as we're concerned, it's done.

(Tr. at 18-19).

        When Wine reported back for work after a scheduled
vacation, he was sent to the mine office, where he was to meet
with Roop, Green Valley Coal President Dave Hughart, and

5

McClung.[1]  (Id. at 19).  Instead, it appears only Hughart and
Roop participated in the meeting with Wine.  (Id.)  Wine observed
that after he explained what transpired on June 27, 2002, Hughart
observed they had originally called him in to terminate his
employment.  (Id.)  Hughart advised after hearing from Wine that
Roop was good friends with inspector Hess and that, since Hughart
did not think Wine had "done anything really wrong[,]" that the
matter might be smoothed over further, perhaps hinting at the
withdrawal of the citation.  (Id. at 20).

        Pending the desired workout with inspector Hess, Wine
was initially told to report to the office rather than the mine.
(Id.)  Upon reporting the first time, however, Roop sent Wine
home with pay until the workout could be achieved.  (Id. at 21).
Wine thereafter phoned Barry Hale, the production manager for
Massey, explained "everything that happened at the mine[,]" and
an additional meeting was arranged between Hale, Roop, and
McClung.  (Id. at 21-22).  When Wine arrived at the meeting, he
found the three other expected participants, along with Frank
Foster, the safety director for Massey.  (Id. at 22).  After
speaking alone with Foster and Hale, Wine was sent home again.
(Id. at 22-23).

---

        [1]Green Valley Coal appears to be an intermediate parent
corporation between Massey and White Buck.  (Id. at 20).

6

On an unknown date thereafter, Hale advised Wine he would be disciplined with a one-week, unpaid suspension.  An August 1, 2002, follow-up letter from Hughart provided as follows:

> This letter is to follow up on the disciplinary action taken by the company regarding your actions on June 28th 2002.  On that date, you violated our company policies by failing to conduct a proper pre-shift examination.
>
> This represents a serious departure from your assigned duties.  It is especially disappointing in light of the fact that you have recently received special training on the proper method of pre-shift examination.
>
> It has been decided that you will be given a one-week suspension without pay.  Furthermore, when you return to work, you will be scheduled for a retraining class on fire bossing responsibilities.  If you have any questions concerning this action, please let me know.

(Gov't. Ex. 4).

On or about July 24, 2002, Wine met with MSHA investigator Jerry Sumpter.  (Tr. at 25).  Hughart advised Wine he could meet with Sumpter without an attorney.  (Id.)  Wine told Sumpter that his White Buck superiors authorized him to perform the pre-shift examinations in the unlawful manner that led to the citation.  (Id. at 26).  Sumpter advised Wine that he did not believe the citation would evolve into a criminal proceeding.  (Id. at 51).

7

Although the exact date is uncertain, sometime around August 2002 Wine met with Massey attorney Mark Heath at the Green Valley Coal office complex.  (<u>Id.</u> at 26).  Upon arriving at the office, Wine encountered Heath, Delmas Bennett, who was employed as a belt man/weekly examiner, and McClung.  (<u>Id.</u>) During the group meeting, Heath discussed the citation with the group. (<u>Id.</u>)

According to Wine, "He told us that he was our attorney" and that "'I'm going to represent you all in this violation against the company.'"  (<u>Id.</u>)  Heath told Wine that he would represent him, Bennett, and White Buck.  (<u>Id.</u>)  Heath concedes he was acting as Wine's attorney at this point.  (<u>Id.</u> at 81).  Wine asked Heath whether the arrangement amounted to a conflict of interest, an inquiry that provoked a negative response from Heath.  (<u>Id.</u> at 28).  A conflict waiver was never discussed.  (<u>Id.</u>)

Heath concedes that it was possible at this point in the process that the citation would evolve into a criminal matter.  (<u>Id.</u> at 93).  Heath further conceded that both Wine and Bennett could be prosecuted for their actions on June 27, 2002. (<u>Id.</u> at 95).  Of utmost significance, Heath conceded that the

8

liability of White Buck on the citation was based upon the
actions of Wine, Bennett, and an hourly electrician employed at
the mine.   (<u>Id.</u> at 105).

        After meeting with the group, Heath then met privately
with Wine.  Heath told Wine that whatever Wine conveyed to him
"was confidential between . . . [Wine] and him."  (<u>Id.</u> at 29).
Wine told Heath that he (Wine) was instructed to do the pre-shift
examinations improperly and that McClung would then improperly
sign Bennett's name to the pre-shift examination record book.
(<u>Id.</u> at 30).  At that juncture, Wine again raised a concern about
Heath's joint representation of all concerned:

> I asked him if there was a conflict of interest between
> me and . . . Bennett because our stories wasn't
> corresponding at the time, and if I needed to get
> another attorney or if I needed -- something had to
> happen.
>
> Q.  What did Mr. Heath tell you?
>
> A.  He said he could represent us.

(<u>Id.</u>)[2]  Heath never explained to Wine that the MSHA citation
could result in Wine's prosecution and civil action by the state
against his certification.

_____

        [2]Bennett told inspectors Hess and Starcher that he logged
Wine's pre-shift report in the record book after Wine called out
the report from inside the mine.  (<u>Id.</u> at 38).  Wine had already
informed the inspectors that he did not call out the report.
(<u>Id.</u>)  By advising the inspectors otherwise, Bennett hoped to
exonerate himself from any wrongdoing. (<u>Id.</u>)

9

In January 2003, Heath became a member of the Spilman firm.  (Id. at 70).  Wine continued his contacts with Heath in person and by telephone.  (Id. at 34).  In April 2003, Heath was informed by AUSA Smith that grand jury subpoenas were being issued to Wine and Bennett.  (Id. at 85).  Heath then informed Wine that same month that a conflict of interest had developed between Wine "and . . . [Heath] or the company, and they had to give me my own attorney . . . Bob Allen."  (Id. at 34).  Heath did not advise Wine concerning the nature of the conflict.  (Id.) There was also no discussion at that time concerning whether Heath would continue to represent White Buck.  (Id. at 59-60).

Allen was apparently paid by Massey and represented Wine for a time.  (Id.)  Wine did not have full confidence that his interests were being protected by Allen, however, whom he deemed to be a company lawyer.  (Id. at 61).  Wine thus later retained his current attorney, McGraw, and entered plea negotiations with the United States Attorney.  (Id. at 35). Massey personnel learned of these discussions, which resulted in the following encounter between Hughart, Mammoth Coal production manager Larry Ward, and Wine:

> One day I was working at the slope, which is 2 Gas
> Mammoth, the president, Dave Hughart, had come up to
> the slope with Larry Ward that day, and met me out in

10

> front of the canopy, and told me that they -- that Mr.
> B, Mr. B they referred to as [Massey CEO] Mr. [Don]
> Blankenship, had received a bill from Mr. McGraw in the
> amount of $25,000 for my case, and he wanted me to drop
> Mr. McGraw and go back to the company attorney, Mr.
> Allen; that they thought that the federal was just
> bluffing on this.  He thought they was just bluffing on
> it, it would be no big deal, and that they could help
> me if I went back to the company attorney, Mr. Allen.

(Id. 35-36).  In a later conversation with Ward, Wine was

encouraged anew to return to his previous attorney-client

relationship with Mr. Allen at company expense:

> He tried to get -- he said that he didn't want to see
> me get in trouble, he hated to see people get in
> trouble, and that he would call the attorney with me
> and go in with me, whatever he needed to do, but he
> would call the attorney with me and try to get me --
> see what they could do.

(Id. at 36).

        In June 2004, Heath and Lusk were advised by AUSA Smith

that additional grand jury subpoenas would be served, apparently

upon other White Buck employees.  (Id. at 87).  Heath and Lusk

also met personally with AUSA Smith around this time.  (Id.)

Heath concedes that even following the May 16, 2006, indictment

in this action he personally continued with the representation of

White Buck in this matter, including the gathering of records and

the review of evidentiary matters.  (Id. at 107).

        On October 11, 2005, Wine and the government concluded

their negotiations and entered into a plea agreement.  (Gov't.

Ex. 6).  Pursuant to that accord, Wine agreed to plead guilty to a one-count information alleging a violation of 30 U.S.C. § 820(d) in that Wine "willfully violated . . . section 75.360(a)(1) by failing to make adequate pre[-]shift examinations . . . ." in May and June 2002.  (<u>Id.</u>; Gov't. Ex. 7).  One condition of the plea required Wine to be completely forthright and truthful with the government and to provide testimony upon request.  (Gov't Ex. 6).  According to the government, "Wine . . . will testify . . . that White Buck, in fact, did prompt, did encourage, did instruct, and was aware that Mr. Wine . . . was doing things in an improper manner" under federal mine safety law.  (Tr. at 7).

At the hearing, Slevin conducted the cross examination of Wine.  During that very careful and searching inquiry, Slevin stepped Wine through each of his encounters with inspectors Starcher and Hess, White Buck, Green Valley, Massey officials, investigator Sumpter, and Heath, all in an attempt to demonstrate beyond cavil that Wine had not shared any information with Heath that had not now become generally known.  Slevin's examination of Wine resulted in the following significant concession:

> Okay.  And what you told Mr. Heath was no different than what you told the officials of the company when you met with them on several occasions, correct?

12

A.  No, sir.

Q.  Okay.  So Mr. Heath didn't learn from you anything
that wasn't already generally known by the government.

A.  No, sir.

(Id. at 55).  Immediately following this exchange, however, the

following additional colloquy occurred:

Q.  Okay.  On that specific incident.

A.  Yes, sir.

Q.  Okay.  And when you met with Mr. Heath again, there
was nothing that you told him that you hadn't already
told to the government.

A.  <u>Yes, sir, there was</u>.

Q.  Pardon me?

A.  Yes, sir, there was.

Q.  Okay.  Okay.  And when did these discussions take
place?  In the fall of 2002?

A.  I can't remember.  I can't recall.

Q.  Would it have been in the months after you first
met with Mr. Heath in -- in August of 2002?

A.  It would have been afterwards, yes, sir.

Q.  And I believe <u>one of the things</u> that you mentioned
to Mr. Heath was your belief that Investigator Sumpter
had falsified your signature on a report, correct?

A.  Yes, sir.

(Id. at 55-56 (emphasis supplied)).[3]  Near the conclusion of the hearing, the court brought this unresolved matter to counsels' attention because it was not explored further by either side during Wine's testimony:

> THE COURT:  There was one somewhat enigmatic response on the . . . examination of the witness Wine. . . . And it had to do with something that Mr. Wine had told Heath that he hadn't told the government.  The matter was not explored, and I didn't know whether at the time it was done simply because defense counsel didn't wish to  pursue the matter or whether, rather, it was a fear that there  would be an invasion of the attorney-client privilege.  If it were the latter, it may be that that is a sufficient reason, and if the court receives a response from Mr. Wine to it at all, that it needs to do so on an ex parte, in-camera basis. Would the parties wish to address that matter?
>
> MR. SMITH:  My suggestion, Your Honor, is that I took the response -- I actually thought he had responded to the question and said that the information he had not provided to Mr. Heath in the first meeting was information about the signature on the written statement, and I thought it was -- actually thought he gave an answer that I understood to be responsive. Now, I may not be correctly parsing out the intention of the question, but I believe it was a responsive answer.  The  question was, was there anything you didn't tell Mr. Heath at this meeting or something like that.  He said yes, it was something he learned later. That's what I thought happened there.  Mr. Wine is still here.  He could be recalled.
>
> THE COURT:  Let me ask the defendant's position on the matter.

_____

[3]This account conflicted with that of Heath.  Heath contends that Wine shared nothing with him that has not now become generally known.  (Id. at 85).

14

MS. LUSK:  That's exactly what we thought as well, Your
Honor.

THE COURT:  Well, subject to the risk that we may need
to call Mr. Wine at another time, I'll just alert the
parties to that now.  We can go ahead and leave the
record in its present posture.  I don't remember it the
way either counsel do, however, and we shall see.

(Id. at 123-24).[4]

        Slevin also examined Wine at length in an attempt to

discredit his claim that he was directed by his White Buck

superiors to conduct the pre-shift examinations in the unlawful

manner that led to the citation.  (Id. 46-47).  Slevin went so

far afield in his attempt to impeach Wine on that point that the

court was required to instruct him concerning the narrow inquiry

then contemplated by the instant motion.  (Id. at 47).

        The foregoing represent the court's findings of fact

based upon the testimony adduced and exhibits offered at the

hearing.  The court perceived an unwillingness by Heath to be

completely forthcoming in all respects.  Some examples illustrate

the point.  First, the court inquired directly of Heath

concerning why he did not immediately spot the conflict-producing

variance between the accounts of Wine and Bennett.  Heath parried

_____

        [4]On January 10, 2007, the court re-convened the hearing, at
which time Wine conclusively clarified that no confidential
information remains extant.

15

the question, referring to Wine's much later grand jury testimony to explain why a conflict was not presented.  (Id. at 81-82). Other examples are present as well.  (See, e.g., id. at 112-13, 113-14).  Wine left no doubt that he considered Bennett to have lied to the two inspectors on the very night of the violation when Bennett told them he recorded the pre-shift examination in the book only after Wine called it out of the mine.  (Id. at 53; note 2 supra).

       Second, Heath conceded on direct examination that after receiving a call from White Buck concerning the investigation, perhaps in July 2002, he "got together the key individuals, which were a total of four, as a group to sit down and talk with them and explain what was going on . . . ."  (Id. at 73).  When asked about the same subject matter a short time later on cross examination, however, Heath muddied the waters on the point:

> Q.  Who called the meeting?
>
> A.  I don't know who called it.  I was coming up there and was -- told them I wanted to meet with a number of folks, and this was the initial folks that I met with.
>
> Q.  Who identified the people who were supposed to be at the meeting?
>
> A.  Hunter, it's been four and a half years.  I believe -- I don't know if the company did that or I did, or both of us together.  There was a number of witnesses that I talked to during that time period.  There were two matters ongoing.

(<u>Id.</u> at 96-97).  Additionally, the court was required, after
objection, to instruct Heath to respond categorically to
questions asked of him on cross examination, with leave to
provide further detail after that if he so desired.  (<u>Id.</u> at 95-
96).

        For these reasons, and others arising from the record,
the court finds the testimony of Wine to be the more credible and
complete version of the events that are specifically disputed in
the briefing relating to the government's pending motion.


                                II.


A.   The Governing Disciplinary Rules


        Until August 1, 2006, the Local Rules of General
Practice provided as follows:

> The Code of Professional Conduct of the American Bar
> Association, the Model Federal Rules of Disciplinary
> Enforcement as adopted by this court, and the Code of
> Professional Conduct as adopted by the Supreme Court of
> Appeals of West Virginia provide the basic ethical
> considerations and disciplinary rules for the conduct
> of attorneys practicing in this court.  In all
> appearances, actions and proceedings within the
> jurisdiction of this court, attorneys shall conduct
> themselves in accordance with the Model Federal Rules
> of Disciplinary Enforcement and the Codes of
> Professional Conduct, and shall be subject to the

                                17

> statutes, rules and orders applicable to the procedures and practice of law in this court.  These codes, rules and orders provide minimal standards for the conduct of attorneys and the court encourages attorneys to conform their conduct to the highest of ethical standards.

Local R. of Gen. Prac. 3.01 (superseded Aug. 1, 2006).  Effective August 1, 2006, the new Local Rules of Civil Procedure provide as follows:

> In all appearances, actions and proceedings within the jurisdiction of this court, attorneys shall conduct themselves in accordance with the Rules of Professional Conduct and the Standards of Professional Conduct promulgated and adopted by the Supreme Court of Appeals of West Virginia, and the Model Rules of Professional Conduct published by the American Bar Association ["ABA"].

Local R. of Civ. Proc. 83.7.  Although the Local Rules of Criminal Procedure do not contain a parallel provision, the court deems this ethical proscription to cross the civil and criminal boundary.

Whether viewed from the standpoint of implicating the ethical obligations of loyalty or confidentiality, any breach would be deemed an ongoing one that would come to fruition during trial.  For this reason, the court applies Local Rule of Civil Procedure 83.7 to this controversy.  The court, accordingly, analyzes the matter with reference to the ABA Model Rules of Professional Conduct and the West Virginia Rules of Professional Conduct.

18

B.   **Rules of Primary Applicability and Analysis Concerning Breach**

The primary rules potentially implicated in this matter are quoted below.  Although both the ABA and West Virginia rules apply, the court quotes only the ABA rules inasmuch as they are deemed to be more restrictive in substance.  This approach is in service of the expectation that members of the bar admitted to practice in this district exercise the highest standards of professional conduct:

ABA Model Rule 1.6: (a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b) [Exceptions that are not in issue in this action].

ABA Model Rule 1.7:  (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or

19

other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

ABA Model Rule 1.9:  (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Regarding Model Rule 1.6(a), there does not appear to be any chance that Ms. Lusk's representation of White Buck will result in the revelation of "information relating to the representation of" Wine.  Wine appears to have revealed the material information surrounding the citation to, at a minimum, inspectors Starcher and Hess, White Buck, Green Valley, and/or

20

Massey officials, and investigator Sumpter even prior to speaking
with Heath.  Additionally, during the hearing in this matter,
Wine freely testified concerning information he shared with Heath
involving the events leading up to and following the citation.[5]
The consequences of that decision are clear in this circuit based
upon our court of appeals' decision in <u>United States v. Jones</u>,
696 F.2d 1069 (4th Cir. 1982):

> Any disclosure inconsistent with maintaining the
> confidential nature of the attorney-client relationship
> waives the attorney-client privilege. Any voluntary
> disclosure by the client to a third party waives the
> privilege not only as to the specific communication
> disclosed, <u>but often as to all other communications
> relating to the same subject matter</u>. <u>In re Sealed Case</u>,
> 676 F.2d 793, 808-09 (D.C. Cir. 1982).

<u>United States v. Jones</u>, 696 F.2d 1069, 1072 (4th Cir. 1982)

(emphasis supplied); <u>Hawkins v. Stables</u>, 148 F.3d 379, 384 (4th

Cir. 1998).

        Heath's compliance with the duty of loyalty imposed by
ABA Model Rules 1.7 and 1.9, a duty characterized by our court of
appeals as "perhaps the most basic of counsel's duties[,]" is an
entirely different matter.  <u>Hoffman v. Leeke</u>, 903 F.2d 280, 288

_____

        [5]Indeed the government appears to have abandoned its
argument that Heath retains any confidential information gathered
during his representation of Wine.  (Gov't. Post Hrg. Br. at 14
("The United States does not dispute that Mr. Wine waived any
attorney-client privilege that might have existed between him and
Mr. Heath.  Mr. Wine did not do this inadvertently but upon the
advice of his present counsel.")).

(4th Cir. 1990).  ABA Model Rule 1.7(a)(1) prohibits Heath, and

the Spilman firm and Ms. Lusk by extension,[6] from engaging in

"the representation of one client [that] will be directly adverse

to another client . . . ."  Comment 29 of that Model Rule

provides as follows:

> In considering whether to represent multiple clients in the same
> matter, a lawyer should be mindful that if the common
> representation fails because the potentially adverse interests
> cannot be reconciled, the result can be additional cost,
> embarrassment and recrimination. Ordinarily, the lawyer will be
> forced to withdraw from representing all of the clients if the
> common representation fails. In some situations, the risk of
> failure is so great that multiple representation is plainly
> impossible. For example, a lawyer cannot undertake common
> representation of clients where contentious litigation or
> negotiations between them are imminent or contemplated. Moreover,
> because the lawyer is required to be impartial between commonly
> represented clients, representation of multiple clients is
> improper when it is unlikely that impartiality can be maintained.
> Generally, if the relationship between the parties has already
> assumed antagonism, the possibility that the clients' interests
> can be adequately served by common representation is not very
> good. Other relevant factors are whether the lawyer subsequently
> will represent both parties on a continuing basis and whether the
> situation involves creating or terminating a relationship between
> the parties.

---

[6]ABA Model Rule 1.10(a) provides as follows:

> While lawyers are associated in a firm, none of them shall
> knowingly represent a client when any one of them practicing alone
> would be prohibited from doing so by Rules 1.7 or 1.9, unless the
> prohibition is based on a personal interest of the prohibited
> lawyer and does not present a significant risk of materially
> limiting the representation of the client by the remaining lawyers
> in the firm.

Id.  The counterpart West Virginia Rule 1.10(a) provides
similarly as follows:

> (a) While lawyers are associated in a firm, none of them shall
> knowingly represent a client when any one of them practicing alone
> would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or
> 2.2.

Id.

22

Id.  Additionally, ABA Model Rule 1.9(a) prohibits "A lawyer who has formerly represented a client in a matter . . . [from] thereafter represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . ." Id.

        Heath represented Wine and White Buck during the investigation of the citation, an inquiry that has now blossomed into the criminal prosecution of both Wine and White Buck. Additionally, Wine will be the key witness against White Buck in this criminal action.  The two entities have held fast to diametrically opposed positions since the day following the citation.  Specifically, Wine has insisted since the morning of June 28, 2002, that his White Buck supervisors instructed him to conduct his pre-shift duties in an unlawful manner.  Since that same time, White Buck has engaged in determined efforts to pin all fault upon Wine for the violation.  When the case is called for trial, one of the most significant challenges for White Buck will be the utter decimation of Wine's credibility.  The architect charged with assembling the stratagem designed to achieve that end is none other than the Spilman firm, with which Heath is now associated.  The conflict of interest could not be clearer.

Heath attempts to overcome this troubling scenario by contending that, in 2002, all indications were that the citation would not evolve into a criminal matter.  That explanation is insufficient.  Were the court to credit Heath's admitted hazy recollection of when he learned of the unabashed dispute between Wine and White Buck on this critical point, he was vested with all necessary facts in that regard in September or October 2002. (Tr. at 120).  It should have been apparent to Heath that the best course at that time was to withdraw from the representation of White Buck, Wine, and Bennett.[7]  As our court of appeals has noted, a conflict of interest is "apparent" when a lawyer "formally represents two parties who have hostile interests."  United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1991); see also United States v. Moscony, 927 F.2d 742, 749 (3d Cir. 1991) ("Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties.").[8]  One has difficulty

_____

[7]Neither of the safe harbors found in the cited rules are applicable here.  By example, Wine never consented to Heath or the Spilman firm continuing to represent White Buck after he jettisoned Wine.

[8]Heath also contends that Wine has consented to the present alignment of counsel or, in the alternative, that Wine has constructively waived any continuing conflict.  There is no basis in the record, however, for making the findings necessary to support either Wine's informed consent to, or his knowing and
(continued...)

imagining a more hostile situation than that presented here: two entities effectively attempting to pin criminal responsibility upon each other.  The same conflict, at least as to ABA Model Rule 1.9(a), continues to this date, and it is imputed to Heath's firm in its continued representation of White Buck here.  The court now turns to the question of disqualification.

## C.   Analysis of the Necessity of Disqualification

In Wheat v. United States, 486 U.S. 153 (1988), the Supreme Court resolved a substantial disagreement in the circuits concerning when a district court may override a defendant's waiver of his attorney's conflict of interest.  Although Wheat dealt with the issue of simultaneous representation of co-defendants, its teachings apply to the present matter involving successive representation.

The court begins with the text of the Sixth Amendment, providing that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. Amend. 6.  At the same time, Wheat

---

[8](...continued)
voluntary waiver of, the conflict.  The court is constrained to reject the argument.

observed that the "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial' . . . and that in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" Wheat, 486 U.S. at 159 (emphasis supplied) (quoted authorities omitted). For this reason, the High Court additionally observed that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id. (citing Morris v. Slappy, 461 U.S. 1, 13-14 (1983); Jones v. Barnes, 463 U.S. 745 (1983)).  Elaborating on that observation, the Supreme Court observed as follows:

> The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government. . . .
>
> In previous cases, we have recognized that multiple representation of criminal defendants engenders special dangers of which a court must be aware. . . . [A] court

confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.  As we said in <u>Holloway</u>:

> "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing . . . · [A] conflict may . . . prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another."

<u>Wheat</u>, 486 U.S. at 159-160 (footnote and citations omitted); <u>see also</u> <u>United States v. Gonzalez-Lopez</u>, 126 S. Ct. 2557, 2561 (2006).

A paramount rule distilled from <u>Wheat</u> is that, even in an environment where all affected defendants waive any conflict resulting from joint representation, special scrutiny must be applied when such conflicts arise:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. Both the American Bar Association's Model Code of Professional Responsibility and its Model Rules of Professional Conduct, as well as the rules of the California Bar Association (which governed the attorneys in this case), impose limitations on multiple representation of clients. <u>See</u> ABA Model Code of Professional Responsibility DR5-105(C) (1980); ABA Model Rules of Professional Conduct, Rule 1.7 (1984); Rules of Professional Conduct of the State Bar of California,

27

> Rules 5 and 7, Cal.Bus. & Prof.Code Ann. § 6076 (West 1974).  Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

<u>Wheat</u>, 486 U.S. at 160; <u>Gonzalez-Lopez</u>, 126 S. Ct. at 2563 n.3 (noting "the right to counsel of choice may be limited by the need for fair trial . . . .").

<u>Wheat</u> accords a district court significant latitude in resolving challenges to counsel such as that presented here, one reason being the sometimes unknown, and indeed unknowable, outcome of allowing a conflicted attorney to proceed.

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult . . . for a lawyer to assess . . . .

> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential

28

for conflict exists which may or may not burgeon into
an actual conflict as the trial progresses. In the
circumstances of this case, with the motion for
substitution of counsel made so close to the time of
trial, the District Court relied on instinct and
judgment based on experience in making its decision. We
do not think it can be said that the court exceeded the
broad latitude which must be accorded it in making this
decision. Petitioner of course rightly points out that
the Government may seek to "manufacture" a conflict in
order to prevent a defendant from having a particularly
able defense counsel at his side; but trial courts are
undoubtedly aware of this possibility, and must take it
into consideration along with all of the other factors
which inform this sort of a decision.

. . . .

The District Court must recognize a presumption in
favor of petitioner's counsel of choice, but that
presumption may be overcome not only by a demonstration
of actual conflict but by a showing of a serious
potential for conflict. The evaluation of the facts and
circumstances of each case under this standard must be
left primarily to the informed judgment of the trial
court.

Wheat, 486 U.S. at 162-63, 164.


         Additionally, the inquiry is a very delicate one in

view of the competing rights involved:

To be sure, this need to investigate potential
conflicts arises in part from the legitimate wish of
district courts that their judgments remain intact on
appeal. As the Court of Appeals accurately pointed out,
trial courts confronted with multiple representations
face the prospect of being "whip-sawed" by assertions
of error no matter which way they rule. If a district
court agrees to the multiple representation, and the
advocacy of counsel is thereafter impaired as a result,
the defendant may well claim that he did not receive
effective assistance. On the other hand, a district

> court's refusal to accede to the multiple
> representation may result in a challenge such as
> petitioner's in this case. Nor does a waiver by the
> defendant necessarily solve the problem, for we note,
> without passing judgment on, the apparent willingness
> of Courts of Appeals to entertain ineffective-
> assistance claims from defendants who have specifically
> waived the right to conflict-free counsel.

<u>Wheat</u>, 486 U.S. at 161-162.[9]

In <u>Wheat</u>, the Supreme Court observed "The Government might readily have tied certain deliveries of marijuana by [the co-defendant] Bravo to petitioner, necessitating vigorous cross-examination of Bravo by petitioner's counsel. [The chosen attorney] Iredale, because of his prior representation of Bravo, would have been unable ethically to provide that cross-examination."  <u>Wheat</u>, 486 U.S. at 164.

---

[9] Quoting the United States Court of Appeals for the Third Circuit in <u>United States v. Dolan</u>, 570 F.2d 1177, 1184 (1978):, the Supreme Court additionally observed as follows:

> "[W]hen a trial court finds an actual conflict of
> interest which impairs the ability of a criminal
> defendant's chosen counsel to conform with the ABA Code
> of Professional Responsibility, the court should not be
> required to tolerate an inadequate representation of a
> defendant. Such representation not only constitutes a
> breach of professional ethics and invites disrespect
> for the integrity of the court, but it is also
> detrimental to the independent interest of the trial
> judge to be free from future attacks over the adequacy
> of the waiver or the fairness of the proceedings in his
> own court and the subtle problems implicating the
> defendant's comprehension of the waiver."

<u>Wheat</u>, 486 U.S. at 162.

Turning to the analysis, one can readily discern the two subjects for inquiry under <u>Wheat</u> when the court is presented, as here, with an actual conflict of interest.  First, the court must ascertain whether the conflict will interfere with the proper functioning of the adversarial process, namely, whether counsel's ethical dilemma robs the client of a constitutionally effective advocate.  Second, the court must ascertain whether allowing conflicted counsel to proceed will cause observers to question the fairness or integrity of the proceeding.

Both inquiries merge here, in view of the fact that the guarantee of an effective advocate and a fair trial hinge on whether Wine can be vigorously cross examined despite the conflict.  Three considerations counsel in favor of permitting Lusk, and hence the Spilman firm, to remain in the case.  First, the court notes that the oft-recurring conflict in successive representation cases involves the friction that results from, on the one hand, safekeeping the former client's secrets while, on the other, being constitutionally required to vigorously seek to discredit the former client on cross examination.[10]   That

_____

[10]Our court of appeals observed as much in <u>United States v. Williams</u>, 81 F.3d 1321, 1324-25 (4th Cir. 1996) (observing "the threat . . . that former representation necessarily pose[s] to .
(continued...)

concern appears absent here.  As noted, no privileged communications between Wine and Heath apparently remain.

        Second, White Buck has offered Robert Luskin, counsel of record from a different law firm, to conduct the Wine cross examination.  The government has not challenged White Buck's observations concerning this proposal, which provide as follows:

> First, Mr. Luskin has had minimal contact with Mr. Heath, and possesses no knowledge of confidential communications that could be used in the cross-examination of Mr. Wine. Second, Mr. Luskin will not hesitate to conduct a rigorous cross-examination of Mr. Wine, and cannot possibly fear breaching a confidential relationship because none ever existed. Third, Mr. Luskin does not anticipate that Mr. Wine will ever be his client and, thus, is not encumbered by the speculative conflict that might arise from the loss of future business.

(Def.'s Memo. of Law Regard. Exam. of Witness at 3-4). Additionally, our court of appeals has tacitly approved such arrangements.  See Williams, 81 F.3d 1321, 1325 (4th Cir. 1996).("While allowing . . . [auxiliary counsel under similar circumstances] might have been within the court's discretion, declining to use it cannot be held an abuse of that discretion.")

_____

[10](...continued)
. . the ability to conduct effective and fair cross- examination of . . . [a] potential witness. . . [in view of the] dual risks of improperly using privileged communications from the previous representation or, by protecting those communications, failing effectively to cross-examine the [formerly represented] witness as . . . [the] present client's interest require[].")

Third, the court has witnessed a preview of sorts concerning what might be expected at trial in the way of Wine's cross examination.  As noted, Slevin, an associate at Luskin's firm, conducted the cross examination of Wine at the hearing on the government's motion.  Slevin in no way avoided confrontation of Wine concerning the salient events relevant to the present inquiry.  Indeed, as noted, the court cautioned Slevin when he opened a second, then irrelevant, line of inquiry aimed at discrediting Wine's central contention that his White Buck superiors directed him to conduct his pre-shift duties in an unlawful manner.

In addition to the two considerations emanating from Wheat, the court has likewise considered any unfairness to Wine by the proposed arrangement, along with the potential impact upon the jury should it learn that Wine was previously represented by a member of the same firm now representing White Buck.  Regarding the first concern, it is important to note that Wine has never moved to disqualify Heath.  Also, Wine has waived any remaining privilege on the apparent subject matter involved in this action.  Finally, his former counsel's present firm will be barred from confronting him on cross examination.  There remains the danger that Wine might be discredited to the point that it impacts the

33

continued viability of his plea agreement or a possible future motion by the government for substantial assistance.  Those same concerns, however, would be present regardless of who cross examined Wine.  Regarding the second concern relating to the jury, the court is unaware of any need by either party, or Wine, to mention the identity or present employment of his former counsel.  Absent such a need, counsel and Wine are instructed to avoid mention of those seemingly immaterial facts unless first seeking and obtaining permission from the court to do so.

Taking all of the foregoing into consideration, the court concludes that, despite the apparent breach of the duty of loyalty to Wine by Heath and, in turn, the Spilman firm, such conflict does not require the court to deny White Buck its choice of counsel.  The court, accordingly, ORDERS that the government's motion to determine conflict of interest be, and it hereby is, denied.

The court makes this determination with an awareness of the few cases from our court of appeals dealing with successive representation problems.  For example, in Williams, an attorney represented the defendant's wife during the investigation of the same criminal proceeding for which the attorney was later retained to represent the defendant husband.   The successive

34

representation commenced after the government indicated that it
would not proceed further against the wife.  As here, the wife
was expected to be a witness for the government in the
defendant's case, and conflicted counsel offered to retain a
different lawyer to cross examine the wife.  The conflicted
lawyer promised that no information derived from his
representation of the wife would be shared with the auxiliary
lawyer.  The district court nevertheless disqualified the
conflicted lawyer and rejected the auxiliary arrangement.  The
court of appeals affirmed, observing as follows:

> Under Wheat and Hoffman[ v. Leeke, 903 F.2d 280, 288
> (4th Cir.1990)], and as is well illustrated by [United
> States v.] Ross [33 F.3d 1507 (11th Cir. 1994)],
> disqualification of Williams's counsel was well within
> the district court's discretion here. As in Ross,
> Williams desired representation by the same lawyer who
> had represented a significant potential witness for the
> government with respect to the same crime.  That lawyer
> would have faced exactly the potential conflict that
> properly concerned the Ross court[, namely, improperly
> using privileged communications from the previous
> representation or, by protecting those communications,
> failing effectively to cross-examine the witness as his
> present client's interest required].  Nor could that
> conflict so surely have been avoided by the device of
> retaining auxiliary counsel for the special purpose of
> cross-examining Ms. Williams that abuse occurred by not
> employing it rather than disqualifying counsel.
> Significant, unavoidable risks would have remained.
> After all, Crawley would remain at counsel table and
> likely be the auxiliary lawyer's chief source of
> information about the case.  And at the time Crawley
> was disqualified, arrangement for auxiliary counsel had
> not, in any event, been made.  While allowing such a
> procedure might have been within the court's
> discretion, declining to use it cannot be held an abuse

of that discretion.

Id. at 1325.  Williams poses no obstacle to Spilman's continued participation in this matter.  As noted, there is no concern that confidential information will hamper the effective cross examination of Wine.

Also worthy of note is United States v. Tatum, 943 F.2d 370 (4th Cir. 1991).  In Tatum, amidst additional, serious conflicts, a trial attorney representing the defendant had previously represented a key government witness, Greene, poised to testify against the defendant.[11]  The court of appeals observed as follows:

> When Gavin also undertook the representation of Greene (Tatum's mechanic and alleged partner) he engaged himself in another irreconcilable conflict. Greene and Tatum worked closely together and both were under grand jury investigation.  Each was entitled to share with Gavin confidential attorney-client information with the reliance that it would not be used against him. That restriction prevented Gavin from representing both. The problem grew to a constitutionally disqualifying one when Greene became the key government witness in Tatum's case.

Id. at 377.  Again, the presence of confidential information in Tatum readily distinguishes it from the instant case.[12]

_____

[11]The profound conflicts in Tatum caused the court of appeals to refer to the affair as a "fog of torn and conflicting loyalties . . . ."  Id. at 377.

[12]The government relies heavily upon the following dicta from In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 340 (4th Cir. 2005):

(continued...)

36

The disposition of the government's motion is contingent upon one requirement.  Although it seems obvious that White Buck desires to waive any conflict associated by Heath's prior representation of Wine, that matter must be resolved finally.  If White Buck desires to enter a waiver, the court ORDERS that a White Buck principal, vested with the legal authority to act on the entity's behalf, along with general counsel and counsel of record, appear on the date set for the hearing on pretrial motions to participate in a colloquy with the

---

¹²(...continued)
Had the investigating attorneys, in fact, entered into an attorney-client relationship with appellants, as their statements to the appellants professed they could, they would not have been free to waive the appellants' privilege when a conflict arose.  It should have seemed obvious that they could not have jettisoned one client in favor of another. Rather, they would have had to withdraw from all representation and to maintain all confidences.  Indeed, the court would be hard pressed to identify how investigating counsel could robustly investigate and report to management or the board of directors of a publicly-traded corporation with the necessary candor if counsel were constrained by ethical obligations to individual employees. However, because we agree with the district court that the appellants never entered into an attorney-client relationship with the investigating attorneys, they averted these troubling issues.

Id.  Although the decision supports the court's conclusion regarding an ethical breach, the absence of any Wheat analysis blunts its impact on the larger question presented by the government's motion.  The decision is thus of minimal utility.

37

court and formally enter its knowing and intelligent waiver of record.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:   January 16, 2007

John T. Copenhaver, Jr.
United States District Judge